In the

# United States Court of Appeals

## For the Seventh Circuit

—————————

No. 21-1599

RANDALL PAVLOCK, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ERIC J. HOLCOMB, Governor of Indiana, *et al.*,

*Defendants-Appellees*.

—————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:19-cv-00466-JD — **Jon E. DeGuilio**, *Chief Judge*.

—————————

ARGUED NOVEMBER 10, 2021 — DECIDED MAY 25, 2022

—————————

Before MANION, WOOD, and SCUDDER, *Circuit Judges*.

WOOD, *Circuit Judge*. In *Gunderson v. State*, 90 N.E.3d 1171
(Ind. 2018), the Indiana Supreme Court held that the State of
Indiana holds exclusive title to Lake Michigan and its shores
up to the lake's ordinary high-water mark. See *id.* at 1173.
*Gunderson* was an unwelcome development for plaintiffs Randall Pavlock, Kimberley Pavlock, and Raymond Cahnman,
who own beachfront property on Lake Michigan's Indiana
shores. Believing that their property extended to the *low-*

water mark, they brought this lawsuit in federal district court alleging that the ruling in *Gunderson* amounted to a taking of their private property in violation of the Fifth Amendment. They would like to hold the state supreme court responsible for this alleged taking. In other words, they are asserting a "judicial taking."

The plaintiffs, whom we will call the Owners, sued a number of Indiana officeholders in their official capacities: Governor Eric Holcomb; the Attorney General, now Todd Rokita; the Department of Natural Resources Director, now Daniel Bortner; and the State Land Office Director, now Jill Flachskam. (We have identified the current officeholders, none of whom was in place when the complaint was filed, with the exception of Governor Holcomb. We have substituted the current officials for their predecessors in accordance with Federal Rule of Appellate Procedure 43(c)(2). We refer to the defendants collectively as the State.) The district court granted the State's motion to dismiss for failure to state a claim. Because none of the named officials caused the Owners' asserted injury or is capable of redressing it, we conclude that the Owners lack Article III standing and affirm the judgment of the district court, though we modify it to show that it is without prejudice.

## I

### A

Indiana has long held in trust the portion of Lake Michigan that lies within its borders and the submerged lands below the water. See *Lake Sand Co. v. State*, 120 N.E. 714, 715–16 (Ind. Ct. App. 1918). The shores of Lake Michigan are surrounded by privately-owned property. Owners of private

lakeshore property, including our plaintiffs, and the State dispute where the line should be drawn between the public and private holdings. In 2014, the Pavlocks' neighbors filed a quiet-title action against Indiana in state court. That was the *Gunderson* case, in which the Indiana Supreme Court first attempted to fix that line.

The *Gunderson* plaintiffs, like the Owners here, took the position that their deeds conferred title (and thus the right to exclude the public) past the lake's ordinary high-water mark, all the way down to the low-water mark. See *Gunderson*, 90 N.E.3d at 1175. The ordinary high-water mark is a commonly used method of measuring the boundaries of non-tidal bodies of water. At common law, it was defined as "the point where the presence and action of water are so common and usual … as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as in respect to the nature of the soil itself." *Id.* at 1181 (collecting authorities) (internal quotation marks omitted); compare 33 C.F.R. § 328.3 (2021) (defining the ordinary high-water mark for the Army Corps of Engineers). By contrast, the low-water mark is the lowest level reached by a lake or a river (for example, a lake's low point during a dry season). *Low-Water Mark*, OXFORD ENGLISH DICTIONARY (3d ed. 2013).

The state supreme court sided with Indiana in *Gunderson*, interpreting state law to require "that the boundary separating public trust land from privately-owned" lakefront property "is the common-law ordinary high water mark." *Gunderson*, 90 N.E.3d at 1173. The court reached its decision by tracing the history of the public-trust doctrine. It began by applying the Equal-Footing doctrine, see, *e.g.*, *PPL Montana, LLC v. Montana*, 565 U.S. 576, 590–91 (2012), under which Indiana

received exclusive title to the lands underlying the Great Lakes when the state was admitted to the Union in 1816. *Gunderson*, 90 N.E.3d at 1176–77 (citing *Martin v. Waddell's Lessee*, 41 U.S. 367, 414 (1842) (holding that when the original thirteen states "became themselves sovereign" each acquired "the absolute right to all their navigable waters and the soils under them for their own common use"); *Utah v. United States*, 403 U.S. 9, 10 (1971) (holding that, under the "'equal footing' principle," later-admitted states acquired "the same property interests in submerged lands as was enjoyed by the Thirteen Original States"); *Hardin v. Jordan*, 140 U.S. 371, 382 (1891) (extending public ownership over navigable waters and underlying land "to our great navigable lakes, which are treated as inland seas.")). Following the weight of authority, the state supreme court concluded that "Indiana at statehood acquired equal-footing lands inclusive of the temporarily-exposed shores of Lake Michigan up to the natural [ordinary high-water mark]." *Id.* at 1181.

The Indiana Supreme Court then asked whether, at some point between statehood and the present day, the state relinquished title to the land below Lake Michigan's ordinary high-water mark. This issue, it recognized, is one of state law. See *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 376–77 (1977) (explaining that, while the Equal-Footing doctrine is a matter of federal law, "subsequent changes in the contour of the land, as well as subsequent transfers of the land, are governed by the state law"). To answer that question, the court examined its own cases, the Lake Preservation Act, Ind. Code § 14-26-2-5, and other provisions of the Indiana Code. It concluded that, with the exception of discrete parcels not relevant here, Indiana has never relinquished title to Lake Michigan's shores below the ordinary

high-water mark. *Gunderson*, 90 N.E.3d at 1182–85. Thus, as a matter of state law, the court concluded that Indiana holds absolute title to the lands under Lake Michigan up to the ordinary high-water mark. Private landowners in Indiana may thus hold title only to beachfront property above (*i.e.* landward of) that boundary. *Id.* at 1182.

Shortly after *Gunderson* was decided, the Indiana General Assembly passed House Enrolled Act (HEA) 1385, which codified the *Gunderson* decision. The Act stipulates that:

> (a) Absent any authorized legislative conveyance before February 14, 2018, the state of Indiana owns all of Lake Michigan within the boundaries of Indiana in trust for the use and enjoyment of all citizens of Indiana.

> (b) An owner of land that borders Lake Michigan does not have the exclusive right to use the water or land below the ordinary high water mark of Lake Michigan.

Ind. Code § 14-26-2.1-3. The plaintiffs argue that HEA 1385 further broadened public use of the Lake Michigan shoreline. *Gunderson* held that "*at a minimum*, walking below the [ordinary high-water mark] along the shores of Lake Michigan" is a protected public use, along with commerce, navigation, and fishing. *Gunderson*, 90 N.E.3d at 1188. The statute, however, expressly recognizes public uses such as boating, swimming, and other ordinary recreational uses. Ind. Code § 14-26-2.1-4(b).

B

Because this case was resolved on a motion to dismiss, we accept all well-pleaded factual allegations in the complaint as true. *Hardeman v. Curran*, 933 F.3d 816, 819 (7th Cir. 2019).

The Owners all hold title to beachfront property on the Lake Michigan shore. None of them was a party to *Gunderson* (though Cahnman participated as *amicus curiae*). Like the Gunderson plaintiffs, the Owners here allege that their property deeds cover land that extends down to Lake Michigan's low-water mark. Therefore, they argue, when the Indiana Supreme Court determined that the state has always held title to the land all the way up to the ordinary high-water mark, Indiana's highest court "took" (for Fifth Amendment purposes) a portion of their property without just compensation. HEA 1385, they argue, was also an uncompensated taking, because it expanded *Gunderson*'s easement to permit additional uses.

Faced with this unfavorable ruling from the state court, the Owners turned to the federal court, filing this action under 42 U.S.C. § 1983 against the state defendants we mentioned, all of whom are sued in their official capacities. The Owners want the federal court to issue a declaratory judgment stating that the Indiana Supreme Court's decision in *Gunderson* (and HEA 1385) effected an uncompensated taking of their property between the ordinary high-water mark and the low-water mark. They also seek a permanent injunction barring the state defendants from enforcing *Gunderson* and HEA 1385. The Owners concede that their challenge to HEA 1385 turns on their judicial-takings claim. If *Gunderson* stands, it follows that the Owners never held title to the land below the ordinary high-water mark, and the legislation therefore had no effect on their property rights. The Owners are not

seeking compensation for the alleged taking; they want only to be able to exclude members of the public from the lands they claim.

The district court granted the State's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). It held that the Owners' claims are functionally equivalent to a quiet-title action, and so are barred by sovereign immunity under *Idaho v. Coeur d'Alene Tribe of Idaho*. See 521 U.S. 261 (1997) (establishing a narrow exception to the *Ex parte Young* doctrine). The court declined to reach the question whether it is possible to state a claim for a judicial taking. Even if the answer were yes, the court reasoned, the Owners could not show that they ever held an "established right" to the property allegedly taken by the state court through *Gunderson*. See *Stop the Beach Renourishment, Inc. v. Florida Dep't of Env't Prot.*, 560 U.S. 702, 713 (2010).

## II

In this court, the Owners have tried to develop their "judicial takings" theory. They contend that the Indiana Supreme Court itself took their property through its *Gunderson* decision, and no state actor has paid them for it. Before discussing this theory any further, it is helpful to provide some context for it.

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V. The Takings Clause applies to the states through the Fourteenth Amendment, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 163–65 (1980), but that does not necessarily mean that it applies to the states' judiciaries. The Supreme Court last

considered the judicial-takings question in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, but in that case, no majority of the Court agreed on "whether, or when, a judicial decision determining the rights of property owners can violate the Takings Clause[.]" 560 U.S. 702, 734 (2010) (Kennedy, J., concurring). Since then, neither this court nor any of our fellow circuits have recognized a judicial-takings claim.

In *Stop the Beach*, only four justices endorsed the argument that a court decision settling disputed property rights under state law could, in some circumstances, violate the Takings Clause. See *id.* at 706, 713–14. There, owners of littoral property challenged a decision of the Florida Supreme Court resolving an open question about the boundary between their private holdings and state-owned land. The case turned on a Florida statute that authorized local governments to restore eroding beaches; under the statutory scheme, the state fixed an "erosion control line" that replaced "the fluctuating mean high-water line as the boundary between" private and state property wherever the preservation projects took place. *Id.* at 709–10. Beachfront property owners sued in state court, arguing that the law deprived them of their property rights without just compensation. The Florida Supreme Court rejected that argument, holding instead that the law did not violate Florida's version of the Takings Clause (which mirrors its Fifth Amendment counterpart). See *Stop the Beach*, 560 U.S. at 712. The property owners appealed to the Supreme Court, arguing that the Florida Supreme Court took their property rights "by declaring that those rights did not exist[.]" *Stop the Beach*, 560 U.S. at 729.

Writing for four Justices, Justice Scalia urged the Court to declare that a judicial decision resolving contested property rights could be a taking. In his view, there was "no textual justification" for "allow[ing] a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat." *Id.* at 714. Justice Scalia's plurality opinion proposed a new test for identifying when a judicial taking occurs: "[i]f a legislature *or a court* declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation." *Id.* at 715 (emphasis in original).

Justices Kennedy and Breyer filed separate opinions concurring in part, and concurring in the judgment, in which they expressed grave doubts about the judicial-takings concept; Justice Stevens, the ninth Justice, took no part in the decision. Justice Scalia's opinion on the key point did not marshal a majority, and no "controlling principle [on the judicial takings issue] can be gleaned" from the plurality and concurring opinions. *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 615 (7th Cir. 2014). Indeed, much of the discussion about judicial takings could be regarded as *dicta*, because the Court unanimously held that in any case, the relevant state-court decision did not effect a taking because it did not "eliminate[] a right [] established under Florida law." *Stop the Beach*, 560 U.S. at 733 ("The Takings Clause only protects property rights as they are established under state law[.]").

Justice Kennedy (joined by Justice Sotomayor) took the position that the state's "vast" power to take property, so long as it acts for a public purpose and provides just compensation, belongs only to the democratically accountable legislative and

executive branches. *Stop the Beach*, 560 U.S. at 734–35 (Kennedy, J., concurring in the judgment). If an arbitrary or irrational judicial decision "eliminates an established property right," he wrote, that decision could be "invalidated under the Due Process Clause" as a deprivation of a property right without due process. *Id.* at 735. The due-process constraint allows states to make reasonable "incremental modification under state common law" but bars courts from "abandon[ing] settled principles." *Id.* at 738. But, he thought, recognizing a claim for judicial takings implies that the courts have the power to take property *with* compensation—a power "that might be inconsistent with historical practice." *Id.* at 739 (discussing the Framers' view of the Takings Clause). Moreover, he wrote, the judicial-takings theory would raise vexing procedural and remedial issues. *Id.* at 740. In a second opinion concurring in the judgment, Justice Breyer (joined by Justice Ginsburg) raised comity and federalism concerns, noting that a claim for judicial takings "would create the distinct possibility that federal judges would play a major role in the shaping of a matter of significant state interest—state property law." *Id.* at 744 (Breyer, J., concurring).

Since *Stop the Beach* was decided, no federal court of appeals has recognized this judicial-takings theory. What has occurred instead is avoidance: every circuit to consider the issue has expressly declined to decide whether judicial takings are cognizable. Instead, each court has assumed without deciding that *if* such a cause of action were to exist, the relevant test would be the one Justice Scalia suggested in his *Stop the Beach* plurality opinion: did some arm of the state declare that "what was once an established right of private property no longer exists"? 560 U.S. at 715. In each of the cases that have reached our sister circuits, the courts have held that the

challenged state-court decision had not erased an *established* property right. Thus, even if there were a theoretical claim for a "judicial" taking, the plaintiffs failed. See *Wells Fargo Bank v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1215–16 (9th Cir. 2020) (declining to answer whether judicial-takings claims are possible when "nothing in Nevada law" showed that plaintiffs had an "established right" to disputed property); *Petrie ex rel. PPW Royalty Tr. v. Barton*, 841 F.3d 746, 756 (8th Cir. 2016) (opting not to decide whether a claim for judicial takings exists where it "would have failed" anyway); *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 425 (3d Cir. 2013) (quickly discarding a claim that a bankruptcy order was a taking because "adjudication of disputed and competing claims cannot be a taking").

### III

The Owners have a different, antecedant problem in the case before us: that of Article III standing. See *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[T]he court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."). The test for standing is a familiar one: "[a] plaintiff has standing only if he can allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, --- U.S. --- -, 141 S. Ct. 2104, 2113 (2021) (citing cases; internal quotations omitted). The party invoking federal jurisdiction has the burden of proving each of these requirements. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992). We are satisfied that the Owners have alleged injury in fact, insofar as they assert that their property was taken without just compensation. They fall short, however, when it comes to causation and redressability.

A

We begin with redressability. The Owners must show that it is "likely … that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotations omitted). They have not done so. None of the defendants sued has the power to grant title to the Owners in the face of the Indiana Supreme Court's *Gunderson* decision and HEA 1385. Even if we were to agree with the Owners, therefore, a judgment in their favor would be toothless.

Redressability turns on the "connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). The Owners' injury stems from the fact that, for many years, Indiana courts had not decided where the public land of Lake Michigan ends and private property begins. The *Gunderson* decision resolved that uncertainty by definitively holding that the boundary lies at the ordinary high-water mark. Essentially, the Owners think that the state supreme court erred by making that decision (either as a matter of state law or federal law), and they would like us to overturn that court's ruling. Until it is set aside, the Owners contend, they have been deprived of their asserted title to the land between the high- and low-water marks without just compensation.

There are a number of problems with this approach, not least of which is that we lack authority to overrule a state supreme court. But the straightforward point is that none of the state defendants the Owners have named—not the Governor, not the Attorney General, not the Indiana Department of Natural Resources, and not the State Land Office—has the power to confer title on the Owners to land that Indiana's highest

court says belong to the state. No injunction we enter can fix that problem.

Typically, a lawsuit alleging that a plaintiff "suffered a violation of his Fifth Amendment rights" is redressable through compensation. *Knick v. Township of Scott*, --- U.S. ----, 139 S. Ct. 2162, 2168 (2019). But the Owners did not sue for compensation from the state of Indiana—and even if they had, it is not clear that federal courts could provide it. The Supreme Court's recent decision in *Knick v. Township of Scott* held that a plaintiff may "bring a 'ripe' federal takings claim in federal court," without first exhausting state remedies, "as soon as a government takes his property for public use without paying for it." *Id.* at 2167, 2170. But unlike *Knick*, which involved a suit against a town, the Owners' suit is against a state, and states enjoy sovereign immunity. See *Jinks v. Richland County*, 538 U.S. 456, 466 (2003) ("[M]unicipalities, unlike States, do not enjoy a constitutionally protected immunity from suit."). Every circuit to consider the question has held that *Knick* did not change states' sovereign immunity from takings claims for damages in federal court, so long as state courts remain open to those claims. See *Zito v. N.C. Coastal Res. Comm'n*, 8 F.4th 281, 286–88 (4th Cir. 2021); see also *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020), cert. denied, --- U.S. ----, 141 S. Ct. 1390 (2021); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019), cert. denied, --- U.S. ----, 140 S. Ct. 2566 (2020). In addition, states are not "persons" for purposes of 42 U.S.C. § 1983. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), and so damages are not available using that theory. Recognizing these hurdles, the Owners seek only equitable and declaratory relief.

Specifically, the Owners want an injunction barring the State from enforcing *Gunderson* or HEA 1385. Assuming for the moment that *Ex parte Young*'s exception to sovereign immunity applies here, see Section IV.A *infra*, and that we can entertain such a request, it remains true that such an injunction would not redress the Owners' injury. Once again, that alleged injury comes from the fact that *Gunderson* recognized that the Owners' property interests end at the ordinary high-water mark on Lake Michigan's shores. An injunction barring the State from enforcing the decision would do nothing to alter the state's title to the land.

*Gunderson* recognized that members of the public have a right to walk on the beach in front of the Pavlocks' house as long as they stay lakeward of the high-water mark; an injunction requiring the State to refrain from any action would not grant the Pavlocks the right to exclude. If Cahnman wants to sell his beachfront property, he may convey land only from the high-water mark. The requested injunction would not give him title to submerged lands that Indiana law (confirmed by both the state's highest court and its legislature) says belongs to the state. To the extent the Owners' deeds conflict with *Gunderson* and HEA 1385, the latter two sources govern. And if, for example, the Pavlocks tried to sue people who walked on the section of beach between the high- and low-water marks for trespass, or Cahnman tried to hoodwink a buyer by representing that he held title down to the low-water mark, an injunction against state officials would not prevent Indiana's Recorder's Offices from correcting that error, or Indiana courts from applying *Gunderson*.

In this respect, the Owners' judicial takings claim differs materially from the one at issue in *Cedar Point Nursery v.*

*Hassid*, --- U.S. ----, 141 S. Ct. 2063 (2021), in which "the gov-ernment physically [took] possession of property without ac-quiring title to it." *Id.* at 2071. In *Cedar Point*, California agri-cultural employers challenged a state regulation that guaran-teed union organizers physical access to their property to or-ganize farmworkers. *Id.* at 2069. The Supreme Court held that California's access regulation was a *per se* physical taking re-quiring compensation and remanded the case for further pro-ceedings. *Id.* at 2080. The *Cedar Point* plaintiffs, like the Own-ers, sought only declaratory and injunctive relief. But unlike our plaintiffs, the California growers' injury was not the loss of a dispute about who held title; it was the uncompensated taking of property that they indisputably owned. A court could redress that injury prospectively by enjoining enforce-ment of the regulation, or retrospectively by ordering just compensation. See *id.* at 2089 (Breyer, J., dissenting). Here, by contrast, ordering any of the named state defendants not to enforce a state property law cannot redress the Owners' inju-ries, because non-enforcement will not change the content of the underlying law itself.

B

The Owners have also failed to establish the related cau-sation requirement for Article III standing. As the parties as-serting federal jurisdiction, they must show that their alleged injury is "fairly traceable" to a defendant's allegedly illegal action, "and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)) (cleaned up).

The property between the high- and low-water marks is held in public trust, but not because of any action taken by

these state defendants. Rather, that property is held in public trust because the Indiana Supreme Court, an independent actor, settled the *Gunderson* dispute as a matter of state law, and the state legislature then confirmed that result. The court relied on a long line of federal and state decisions recognizing the Equal-Footing doctrine and setting the boundaries between Indiana's public trust lands and surrounding private property. See *Gunderson*, 90 N.E.3d at 1179–87. The Owners attempt to dodge this problem by suing state officials who are charged with enforcing state property law. As we already have said, however, the state's enforcement or non-enforcement has no effect on the underlying title to the land. Moreover, the Owners' complaint does not include any allegations showing that the state defendants' enforcement of *Gunderson* has caused any further injury that they have not already experienced as a result of the decision itself. The Owners' injury is therefore traceable not to the state defendants, but to the independent actions of the Indiana Supreme Court.

C

The Owners' causation and redressability problems highlight the federalism and comity concerns that are inherent in the judicial-takings theory. In *Gunderson*, the Indiana Supreme Court resolved a state-law issue of first impression and issued a thorough decision determining where the public-private boundary lies on the shores of Lake Michigan. If the court is correct, then the property between the ordinary high-water mark and the low-water mark could not have been taken, because it was never privately owned in the first place. See *Conyers v. City of Chicago*, 10 F.4th 704, 711 (7th Cir. 2021) (noting that there is a "predicate requirement [in Takings cases] that the private property [allegedly taken] must belong to the

plaintiff.") The Owners may be able to say, in good faith, that their expectations were disturbed, just as any losing party in a state court case involving disputed property rights might do. But it is the role of "the state court … to define rights in land located within the states." *Fox River Paper Co. v. R.R. Comm'n of Wis.*, 274 U.S. 651, 657 (1927) (adding that "the Fourteenth Amendment, in the absence of an attempt to forestall our review of the constitutional question, affords no protection to supposed rights of property which the state courts determine to be nonexistent"). If the Owners never had title to this property under Indiana law, it could not have been "taken" by the state.

As we noted earlier, it is state property law itself, rather than any action by the state parties, that is adverse to the Owners' claims. We would be unable to hold that their property was taken without also holding that *Gunderson* was wrongly decided. In effect, their theory of the case would have us sit in appellate review of the Indiana Supreme Court's decision about state property law—a role that would sit uneasily next to the Supreme Court's exclusive "statutory authority to review the decisions of state courts in civil cases." *Milchtein v. Chisholm*, 880 F.3d 895, 897 (7th Cir. 2018) (citing 28 U.S.C. § 1257). We recognize, in this connection, that the *Rooker-Feldman* doctrine does not apply here, because the Owners were not parties to the *Gunderson* litigation. See *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Nonetheless, that doctrine's animating federalism values counsel us to proceed cautiously when a novel legal theory raises the specter of a lower federal court reviewing the merits of a state supreme court's decision.

## IV

Before concluding, we note that the district court dismissed this case for two additional reasons. First, it held that it lacked subject-matter jurisdiction because this case falls under a narrow exception to the *Ex parte Young* doctrine established by the Supreme Court's decision in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997). Generally, a plaintiff may sue under *Ex parte Young*'s exception to the Eleventh Amendment's sovereign-immunity bar so long as the complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). In *Coeur d'Alene Tribe*, however, the Supreme Court announced that the *Ex parte Young* rule has a narrow exception for a "quiet title suit against [a state] in federal court" or a suit for injunctive relief that is "close to the functional equivalent of quiet title." 521 U.S. at 281–82; see also ERWIN CHEMERINSKY, FEDERAL JURISDICTION (7TH EDITION) 471, 477–78 (2016).

Pointing to some criticism of *Coeur d'Alene Tribe,* the Owners suggest that it was a one-way, one-day case with no further applicability, or alternatively, that it does not apply to suits brought by private property holders rather than Tribal nations. The State responds that *Coeur d'Alene Tribe* remains good law and squarely governs this case, because it is "close to the functional equivalent of quiet title." *Coeur d'Alene*, 521 U.S. at 282.

The district court agreed with the State. In addition, it held that even assuming the judicial-takings theory might apply somewhere, the Owners had not managed to state a claim under it here. Recall that Justice Scalia's proposed test for a judicial taking requires plaintiffs to show that "the property right

allegedly taken was *established*" as a matter of state law, prior to the decision. See *Stop the Beach*, 560 U.S. at 728 (emphasis added). The district court thought that the Owners' complaint revealed on its face that no such right was established. Prior to *Gunderson*, it noted, the status of Indiana's Lake Michigan coastline had been ambiguous at best. The Owners have not and could not show that the Indiana Supreme Court's decision was a sharp or unexpected departure from a clearly established property right. Rather, the state court in *Gunderson* settled an unclear and disputed issue of first impression. The district court therefore noted that, even if it had jurisdiction over the case, it would have dismissed the Owners' action for failure to state a claim under Rule 12(b)(6).

Because the Owners lack standing to sue the state defendants, we need not reach either the *Coeur d'Alene* issue or the alternative ruling under Rule 12(b)(6) today. We merely note that the Owners could not prevail without also overcoming these additional hurdles.

## V

The Owners contend that the Indiana Supreme Court's decision in *Gunderson v. Indiana* unconstitutionally took their property without compensation. Because they have sued the Indiana Governor and several state executive officials who neither caused the asserted injury nor can redress it, they lack standing to sue under Article III of the Constitution. We therefore AFFIRM the district court's dismissal of the complaint for lack of subject-matter jurisdiction, although we modify it to a dismissal without prejudice.