FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

LUCIA F. SANCHEZ; MICHAEL F.
SANCHEZ, JR.; ERIK BRIONES;
RICHARD JENKINS; ROLAND
RIVERA,

    Plaintiffs - Appellants,

v.

RAÚL TORREZ, in his official capacity as
Attorney General of New Mexico;
RICHARD STUMP, in his official capacity
as Chair of the New Mexico State Game
Commission; SHARON SALAZAR
HICKEY, in her official capacity as Vice-
Chair of the New Mexico State Game
Commission; TIRZIO LOPEZ, in his
official capacity as a member of the New
Mexico State Game Commission; GREGG
FULFER, in his official capacity as a
member of the New Mexico State Game
Commission; DR. SABRINA PACK, in
her official capacity as a member of the
New Mexico State Game Commission;
EDWARD GARCIA, in his official
capacity as a member of the New Mexico
State Game Commission; FERNANDO
CLEMENTE, JR., in his official capacity
as a member of the New Mexico State
Game Commission; MICHAEL SLOANE,
in his official capacity as Director of the
New Mexico Department of Game & Fish,

    Defendants - Appellees.
_____

No. 25-2009

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:24-CV-00646-KWR-LF)**

_____

Christopher M. Kieser, Pacific Legal Foundation, Sacramento, California (Jeremy Talcott, Pacific Legal Foundation, Sacramento, California; and Mark L. Ish, Felker, Ish, Ritchie, Geer & Winter, P.A., Santa Fe, New Mexico, with him on the briefs), for Plaintiffs-Appellants.

James W. Grayson, Chief Deputy Attorney General, New Mexico Department of Justice, Santa Fe, New Mexico (Raúl Torrez, New Mexico Attorney General; and Mark T. Baker, Matthew E. Jackson, and Abigail L. Pace, Peifer, Hanson, Mullins & Baker, P.A., Albuquerque, New Mexico, with him on the brief), for Defendants-Appellees.

_____

Before **PHILLIPS**, **McHUGH**, and **FEDERICO**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

The Plaintiffs-Appellants in this appeal are five New Mexico landowners: Lucia F. Sanchez, Michael F. Sanchez Jr., Roland Rivera, Erik Briones, and Richard Jenkins (collectively, "the Landowners"). The Landowners each hold title to non-navigable streambeds of the Rio Tusas or Pecos River in New Mexico. The Landowners assert that they once held the right to exclude members of the public from walking or wading in their private streambeds but that the New Mexico Supreme Court changed established property law and eliminated this right to exclude. Accordingly, the Landowners claim the New Mexico Supreme Court's decision amounted to a judicial taking of their right to exclude without just compensation in violation of the Fifth Amendment.

The district court concluded the Landowners lacked standing and that their claims were barred by sovereign immunity. It therefore dismissed their Complaint under Federal

Rule of Civil Procedure 12(b)(1) based on a lack of subject matter jurisdiction. Although we conclude the Landowners have standing and that sovereign immunity does not bar their claims, establishing our jurisdiction to hear this matter, we affirm the dismissal of the Landowners' Complaint for failure to state a claim under Rule 12(b)(6).

## I.    BACKGROUND

### A.    Factual Background[1]

In 1907, before New Mexico became a state, the territorial legislature enacted a statute declaring that all "natural waters flowing in streams and watercourses . . . belong to the public and are subject to appropriation for beneficial use." N.M. Stat. Ann. § 72-1-1 (1907). When New Mexico achieved statehood in 1912, this provision was incorporated into the state constitution as Article XVI, Section 2. *See State ex rel. State Game Comm'n v. Red River Valley Co.*, 182 P.2d 421, 461 (N.M. 1945). That provision reads in full:

> The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right.

N.M. Const. art. XVI, § 2. We refer to Article XVI, Section 2 as the public waters provision.

In 1945, the New Mexico Supreme Court sought to interpret the public waters provision of its constitution in *State ex rel. State Game Commission v. Red River Valley Co.* Specifically, the court considered whether the public had a constitutional right to fish

---

[1] Because this matter comes to us following a motion to dismiss, we rely on the Complaint's allegations for our account of the factual background.

and recreate in non-navigable waters found on privately owned land—there, a portion of a reservoir. *Red River Valley*, 182 P.2d at 424–26. The court concluded that the public waters provision was merely declaratory of the law as it had always existed under Spanish-Mexican law and as it had continued after American acquisition. *Id.* at 427–29. The waters were, and always had been, public. *Id.* at 434. Having found that all "unappropriated waters from 'every natural stream, perennial or torrential, within the state of New Mexico'" were public, the court then concluded that, because the public's right to fish in and use public waters was well established, the public likewise had a right to fish in the public, non-navigable waters that ran through private property. *Id.* at 430–31 (quoting N.M. Const. art. XVI, § 2). However, because the state owned a portion of the reservoir through which land the public would access these waters, "[t]he question of right of use, or trespass upon, the lands . . . bordering upon the lake area in question [was] not involved" in the court's decision. *See id.* at 426–27.

In the years following *Red River Valley*, the New Mexico Department of Game and Fish ("the Department") issued fishing proclamations informing the public that the right to fish and recreate in public waters did not give individuals a right to trespass on privately owned land. For example, in 1991 the Department issued a proclamation containing a section entitled "Private Lands, Trespass, Stream Beds, Access" in which it directed the public to "[o]btain permission before fishing on private lands" and warned that the proclamation should not be construed as authorizing "entry into or onto any privately owned property, including stream beds, without the landowner's permission."

4

App. at 37. Later, in 1998, the Department issued a proclamation with an "Access for Fishing" section containing similar language. App. at 48.

In 2015, the New Mexico state legislature passed a law congruent with the Department's prior understanding of the rights conferred by the public waters provision. The law required individuals engaged in "hunting, fishing, trapping, camping, hiking, sightseeing, the operation of watercraft or any other recreational use" to receive express permission in writing from the person in control of private property if the individuals wished to "walk or wade onto private property through non-navigable public water or access public water via private property." N.M. Stat. Ann. § 17-4-6(C) (2015).

In 2018, the New Mexico Game Commission ("the Commission") issued implementing regulations for this law, allowing landowners "to be issued a certificate and signage by the director and the commission that recognizes that within the landowner's private property is a segment of a non-navigable public water, whose riverbed or streambed or lakebed is closed to access without written permission from the landowner." N.M. Admin. Code § 19.31.22.6 (repealed 2022). Once the landowner was issued a certificate, the landowner became eligible to receive signs from the Commission informing the public that individuals were required to receive written permission before walking or wading in non-navigable public waters on private property. *Id.* § 19.31.22.13(C)–(D). These signs would then act as "prima facie evidence that the property subject to the sign is private property, subject to the laws, rules, and regulations of trespass." *Id.* § 19.31.22.13(F). One of the Landowners in this case, Mr. Briones,

received such a certification along with Department-issued trespassing signs for his property.

These implementing regulations, however, were soon challenged. And in 2022, the New Mexico Supreme Court in *Adobe Whitewater Club of New Mexico v. New Mexico State Game Commission*, 519 P.3d 46, 56 (N.M. 2022), invalidated the regulations as an unconstitutional infringement on the public's right to use public water. Looking to *Red River Valley*, the court held that the public waters provision of the New Mexico Constitution granted the public, in addition to a right to fish and recreate in public waters, a right to touch the privately owned beds of public waters because "[w]alking and wading on the privately owned beds beneath public water is reasonably necessary for the enjoyment of many forms of fishing and recreation." *Id.* at 49, 53. The court emphasized, however, that the scope of the public's right includes only uses reasonably necessary to the utilization of the water itself. *Id.* at 56. And it noted that any use of the riverbeds and banks for these purposes must have minimal impact. *Id.* Notwithstanding its extension of the reasoning in *Red River Valley*, the court stressed that the public had no right to "trespass on privately owned land to access public water, nor trespass on privately owned land from public water." *Id.* at 53.

Although the regulations were an unconstitutional limitation on the public's right to recreate in public waters, the court read N.M. Stat. Ann. § 17-4-6(C), the underlying statute, to avoid the constitutional question. *Id.* at 56–57. The court found two possible interpretations of the law: "(1) the public cannot walk or wade onto private property (*excluding* the beds of public water) from public water" and cannot cross over private

6

property to reach those waters or "(2) the public cannot walk or wade onto private property (*including* the beds of public water) from public water" and cannot cross over private property to reach those waters. *Id.* Finding that the latter interpretation would be unconstitutional but that the former would raise no constitutional question, the court adopted the former interpretation and thus did not invalidate the underlying law. *Id.*

The New Mexico Supreme Court then rejected arguments that its recognition of a public right to access riverbeds and banks would be a taking of streambed owners' right to exclude, without compensation, in violation of the Fifth Amendment. *Id.* at 57. First, it concluded that the New Mexico Constitution's public waters provision and "the public's easement in public water stem from prior existing law recognized by the United States government," which was "only declaratory of prior existing law, always the rule and practice under Spanish and Mexican dominion." *Id.* (quoting *Red River Valley*, 182 P.2d at 427). Accordingly, the waters were and always had been public. *Id.* And the landowners' ownership interest had always been subject to a preexisting easement held by the public. *Id.* at 57–58. The court held that it had merely clarified the scope of that easement and that nothing had been taken from the landowners. *Id.* at 58.

Following this decision, New Mexico officials took steps to enforce *Adobe Whitewater*'s holding. The Commission repealed the regulations allowing streambeds to be certified as private, 33 N.M. Reg. 485 (Mar. 22, 2022), and sent letters to owners of previously certified streambeds informing them that their certificates were void. The letters directed landowners to take down any signage referencing certification or restricting public access to the water as well as directing them to remove barriers limiting

access to public water on their property. New Mexico Attorney General Raúl Torrez has also sought to enforce *Adobe Whitewater*—having brought a now-settled enforcement action against Plaintiff Mr. Briones asserting his use of signs and fencing impermissibly restricted access to the Pecos River. Plaintiff Mr. Jenkins has likewise received informal threats of enforcement.

### B.    *Procedural Background*

The Landowners thereafter filed their Complaint against state officials responsible for enforcing *Adobe Whitewater*'s holding: the New Mexico attorney general, the director of the New Mexico Department of Game and Fish, and various members of the New Mexico State Game Commission (collectively, "the New Mexico Officials"). The Landowners claim that *Adobe Whitewater*'s holding and the New Mexico Officials' enforcement of that holding amount to a taking of the Landowners' property—that is, their right to exclude—for public use without just compensation in violation of their Fifth and Fourteenth Amendment rights as enforceable under 42 U.S.C. § 1983. The Landowners requested an injunction barring the New Mexico Officials from taking any action preventing them from exercising their right to exclude or from taking any action penalizing the Landowners for exercising that right. They also sought a declaratory judgment asserting that *Adobe Whitewater*'s holding declaring a public right to wade and walk in the Landowners' private streambeds amounts to an unconstitutional taking of their right to exclude.

The New Mexico Officials filed a motion to dismiss, asserting that the Landowners lacked standing to bring their claims and that the Landowners' claims were

barred by sovereign immunity under the Eleventh Amendment. In the motion, the New Mexico Officials further argued that the court should abstain from deciding a matter of New Mexico law, that the Landowners failed to state a claim for relief, and that Mr. Briones's claim was barred by the *Rooker-Feldman* doctrine, as set forth in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), based on a consent decree that he entered in his state enforcement action.

The district court granted the motion to dismiss, concluding that the Landowners lacked standing and that sovereign immunity barred their claims. Although the district court held that the Landowners had each alleged an injury in fact based on a credible threat of prosecution, it found that the Landowners failed to meet the other elements of standing under Article III of the U.S. Constitution: traceability and redressability. As to redressability, the court concluded that the requested injunction preventing enforcement of the decision in *Adobe Whitewater* would not remedy the Landowners' injuries because the New Mexico Constitution itself forbids the Landowners from excluding the public from their streambeds, and the public would retain its right in the absence of state enforcement. Furthermore, the district court determined that the Landowners' injuries were not traceable to the challenged state enforcement because an independent third party—the New Mexico Supreme Court—was responsible for the Landowners' loss of their right to exclude.

With respect to the Eleventh Amendment, the district court held that sovereign immunity precluded it from exercising jurisdiction. Although the court recognized that

9

lawsuits for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908), do not offend sovereign immunity, it held that the Landowners' claims were nonetheless barred because their requested relief would have the effect of requiring the payment of funds from New Mexico's treasury. The court reasoned that the New Mexico Officials would be constitutionally bound to enforce the public's right to access these private streambeds and would thereby be required to provide just compensation for the public easement. Finally, the district court added that the Eleventh Amendment barred the lawsuit based on the Landowners' failure to exhaust state-law remedies.

Because the district court dismissed all claims on jurisdictional grounds, it did not address whether the Landowners stated a claim for a Fifth Amendment taking. The district court entered judgment dismissing all claims. This appeal followed.

## II.    DISCUSSION

We begin by addressing the jurisdictional arguments considered by the district court as well as those raised by the parties on appeal. Because we conclude that none of these jurisdictional grounds bar the Landowners' claims, we then address whether the Landowners' Complaint states a claim for a Fifth Amendment taking.

### A.    *Standing*

The district court held that the Landowners had alleged a credible threat of prosecution and an adequate injury in fact for purposes of standing. But because the Landowners' alleged loss of property rights was caused by the New Mexico Supreme Court—not the New Mexico Officials—the district court held that the Landowners' injury was not traceable to the New Mexico Officials in this case. Furthermore, the court

10

concluded that the Landowners' injury was not redressable by a favorable decision because the public had other ways to enforce their public right to access the Landowners' streambed in the absence of state enforcement.

While the court correctly identified a credible threat of enforcement as an injury in fact, it mistakenly analyzed traceability and redressability with reference to a different injury—the loss of the Landowners' right to exclude. Although the alleged loss of property rights was not caused by the New Mexico Officials, the threat of enforcement is. And although the Landowners' requested injunction would not return their lost property right or prevent enforcement by the public, it would redress the threat of prosecution by officials with special enforcement authority. Thus, partial redressability was available and, as we explain, is sufficient for standing.

**1.    Standard of Review**

Article III permits federal courts to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2. To establish Article III standing to sue, a plaintiff must establish that (1) "it has suffered an injury in fact"; (2) "the injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely . . . that the injury will be redressed by a favorable decision." *People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 996–97 (10th Cir. 2017) (quotation marks omitted). We review a district court's determination of standing de novo. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).

An injury in fact is "an invasion of a legally protected interest which is . . . concrete and particularized and . . . actual or imminent, not 'conjectural' or

11

'hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). The mere presence of an unconstitutional law that inhibits constitutionally protected conduct or interests is not an actual or imminent injury. *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006). However, a plaintiff need not wait until a statute is enforced against him. *Id.* "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). In other words, a plaintiff's protected activities "must be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the [law's] enforcement." *Winsness*, 433 F.3d at 732 (internal quotation marks omitted).

To meet the traceability requirement, "there must be a causal connection between the injury and the conduct complained of," and the injury must not be "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation marks and brackets omitted) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Finally, redressability turns on the "connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted) (quoting *Simon,* 426 U.S. at 38, 43). Yet complete redressability of the plaintiff's

injuries is not required. A plaintiff need show only that a favorable decision would redress "*an* injury," not "*every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original).

**2.    Analysis**

   *a.    Injury in fact*

The district court determined that the Landowners had suffered an injury in fact for purposes of standing. In particular, the court determined that, while not all the Landowners had faced adverse action by the state, each faced a credible threat of prosecution. Because the Landowners had pointed to actions in which the New Mexico attorney general sought to enforce *Adobe Whitewater* "against similarly situated landowners who do not permit public access to their streambeds," the Landowners had shown "a sufficiently credible threat of prosecution to justify prospective relief." App. at 178.

The New Mexico Officials argue that no such injury has been established because *Adobe Whitewater* held that the Landowners never held their claimed property right. Thus, they argue that the Landowners never lost a property right, and so they have not suffered an injury.

Where, as here, the alleged injury is the threatened enforcement of a law, the Supreme Court has held that a plaintiff satisfies the requirement to show an injury in fact where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and there exists a credible threat of prosecution thereunder." *Babbitt*, 442 U.S. at 298. While a history of prior prosecution

may support a finding that the threat is credible, *see Susan B. Anthony List*, 573 U.S. at 164, a showing of past enforcement is not required, *see Babbitt*, 442 U.S. at 302.

In a pre-enforcement lawsuit, drawing the line as to where a credible threat of enforcement begins is often not a simple task. *Compare Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1154, 1156 (10th Cir. 2006) (concluding that an adult bookstore faced a credible threat of prosecution under a city ordinance requiring licensing of "sexually oriented businesses" when the city sent letter stating that bookstore must complete an application for license or "appropriate legal action will be commenced"), *with Mink v. Suthers*, 482 F.3d 1244, 1254–55 (10th Cir. 2007) (finding no credible threat of prosecution when district attorney authored a "no file" letter disavowing any intent to prosecute under challenged criminal-libel statute, even though the "no file" letter "conceivably might not bind other district attorneys"). Still, showing a credible threat of enforcement is not a high bar. We have noted that "[t]he threat of prosecution is generally credible where the defendant 'has not disavowed any intention of invoking' the statute against the plaintiff." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110 (10th Cir. 2024) (quoting *Babbitt*, 442 U.S. at 302).

In the case at bar, the Landowners allege that they "seek to assert the traditional right New Mexicans have had to exclude trespassers from their privately-held streambeds." App. at 16. They contend they have put up signs warning the public that the streambeds are private, put up "fences that block trespassers from wading down the river from adjacent areas," and verbally confronted trespassers. *Id.* at 25–26.

Having taken these actions, the Landowners assert that they face a threat of future prosecution because "[t]he New Mexico Attorney General, the New Mexico Game Commission, and the Department of Game & Fish have taken action against property owners who continue to exercise their right to exclude." *Id.* at 15. These actions include "suing Plaintiff Briones and, through a designated representative, issuing threats to Plaintiff Jenkins for exercising their right to exclude the public from their private streambeds." *Id.* at 20. Indeed, Mr. Briones has already faced an enforcement action by the New Mexico attorney general seeking to enjoin him from using barriers and threats to prevent the public from accessing his streambeds. Accordingly, the Landowners state they are fearful of future enforcement actions if they continue to assert their right to exclude.

The Landowners have easily pleaded an intention to engage in a course of conduct that is arguably proscribed by the New Mexico Constitution and *Adobe Whitewater*. Further, they have shown that the threat of enforcement they face is credible if they continue to exclude the public. Mr. Briones has already faced an enforcement action. And while factual dissimilarity can lessen the likelihood of a credible threat, all Landowners in this matter appear to be similarly situated to Mr. Briones. *Cf. D.L.S. v. Utah*, 374 F.3d 971, 973–75 (10th Cir. 2004) (finding no credible threat of enforcement of a sodomy statute against an unmarried man who occasionally engaged in prohibited but consensual conduct with an unmarried woman where the prosecutor assured the plaintiff he would not be prosecuted for his conduct and the plaintiff pointed to only one instance of past enforcement for dissimilar conduct involving a minor). Most importantly, the New

15

Mexico Officials have not disavowed their intention to enforce the *Adobe Whitewater* mandate against the Landowners.

The New Mexico Officials' argument that the claimed right to exclude never existed—while relevant to the merits of the Landowners' taking claims—does not undermine the Landowners' alleged injury. "For purposes of standing, we must assume the [Landowners'] claim[s] ha[ve] legal validity." *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (noting that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). Furthermore, the Landowners face another injury independent of their claimed property right. Regardless of the merits of their lawsuit, there is no question that the Landowners face a credible threat of enforcement for engaging in conduct arguably proscribed by the New Mexico Constitution. Accordingly, the Landowners have alleged a cognizable injury for purposes of standing.

> b.    *Traceability*

Despite finding an injury, the district court held that the Landowners did not meet the other requirements of standing. As to traceability, the court concluded that the Landowners' injury is not traceable to the challenged conduct of the New Mexico Officials. Specifically, the district court noted that the Landowners "lost their right to exclude the public from their private streambeds not because of any action taken by the

16

[New Mexico Officials]" but instead because "the New Mexico Supreme Court—an independent third party—decided that its constitution required it." App. at 180.

The Landowners argue that traceability in a pre-enforcement action requires only that the defendants have authority to enforce the complained-of law. They maintain that the district court erred because traceability does not require the defendant to have caused the law to go into effect. Rather, because the New Mexico Officials enforce *Adobe Whitewater*'s holding through prosecutions, the Landowners contend their injury of threatened prosecutions is caused by the New Mexico Officials.

To meet the traceability requirement, "there must be a causal connection between the injury and the conduct complained of," and the injury must not be "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal quotation marks and brackets omitted) (quoting *Simon*, 426 U.S. at 41–42). "It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular [law], the causation element of standing requires the named defendants to possess authority to enforce the complained-of [law]." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007).

In conducting its traceability analysis, the district court relied on the Seventh Circuit case *Pavlock v. Holcomb*, 35 F.4th 581 (7th Cir. 2022). The *Pavlock* court considered claims by landowners asserting that the Indiana Supreme Court, in holding that the landowners' title extended only to the high-water mark of Lake Michigan rather than the low-water mark, had taken their property without just compensation. 35 F.4th at 583. Without addressing the merits of the plaintiffs' claims, the Seventh Circuit held that

17

the plaintiffs lacked standing to bring their claims. *Id.* As to traceability, the court stated that the plaintiffs' claimed injury of the loss of property between the high- and low-water marks was not caused by the named state defendants. *Id.* at 590. Rather, the plaintiffs' claimed property was "held in public trust because the Indiana Supreme Court, an independent actor, settled the . . . dispute as a matter of state law." *Id.*

The *Pavlock* court noted the plaintiffs' traceability problem could not be avoided by suing the executive officials entrusted with enforcing the law. "[T]he state's enforcement or non-enforcement ha[d] no effect on the underlying title to the land." *Id.* And the court emphasized that, aside from the loss of their property right, the complaint had not alleged that the Indiana Supreme Court's decision "ha[d] caused any further injury that they have not already experienced as a result of the decision itself." *Id.*

Notwithstanding the district court's reliance on *Pavlock*, the claimed injury in that case was materially different than the injuries in the case at hand. In *Pavlock*, the plaintiffs alleged no injury other than the loss of property itself and did not point to any specific enforcement action creating a separate injury. The causation problem in *Pavlock* resulted, not only because the executive defendants did not cause the loss of property rights, but also because they did not cause any other injury. Here, however, the Landowners allege more than a lost property right. Indeed, the principal injury alleged is the threat of a future enforcement action if the Landowners continue their efforts to exclude the public.

The district court correctly identified this threat of prosecution as an adequate injury in fact. Yet its traceability analysis relied instead on the loss of the right to exclude

18

as the relevant injury. Courts must analyze traceability with reference to the plaintiff's injury in fact. *See Lujan*, 504 U.S. at 560. While the loss of the Landowners' right to exclude may have been caused by the New Mexico Supreme Court as an independent third party not before the court, no such traceability problem exists with respect to the threat of enforcement. There is no question that the New Mexico Officials have authority to enforce *Adobe Whitewater* by bringing actions against violating landowners. The Landowners' injury of threatened prosecution is therefore fairly traceable to the New Mexico Officials. *See Bronson*, 500 F.3d at 1110 ("[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular [law], the causation element of standing requires the named defendants to possess authority to enforce the complained-of [law].").

      *c.*     *Redressability*

Turning to redressability, the district court concluded that the Landowners' injury would not be redressed by a favorable decision enjoining state officials from enforcing the decision in *Adobe Whitewater*. Because the New Mexico Constitution itself forbids landowners from excluding the public from their streambeds, the district court reasoned that the public would still have a right to access those streambeds, and the Landowners would be without a legal remedy to restrict access. Even if the state officials ceased enforcement of the *Adobe Whitewater* directive, the court noted that "the public has other ways to preserve its constitutional right to recreate in public waters (for example, by court order or going to the local sheriff)." App. at 179. In sum, the court concluded that "[a]bsent constitutional amendment or the New Mexico Supreme Court reversing its

position, landowners remain powerless to remove members of the public from their streambeds with or without executive enforcement, and therefore, their injury will remain." *Id.* at 180.

The Landowners argue that, because their claimed injury is one of enforcement by the New Mexico Officials and not an injury caused by trespassers, their injury would be redressed by the requested injunction. Furthermore, they contend that an injury need only be partially redressable to qualify for Article III standing.

Redressability turns on the "connection between the alleged injury and the judicial relief requested." *Allen*, 468 U.S. at 753 n.19. "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). However, the Supreme Court has rejected interpretations of the rule that demand complete redressability, stressing that a plaintiff need show only that a favorable decision would redress "*an* injury," not "*every* injury." *Larson*, 456 U.S. at 243 n. 15 (emphasis in original). Nor must any one injury be completely redressable so long as a favorable decision would "alleviate the injury to some extent." *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012); *see also Massachusetts v. EPA*, 549 U.S. 497, 526 (2007).

Here again, the district court mistakenly analyzed redressability of the Landowners' lost right to exclude rather than the threat of prosecution. While an injunction preventing the New Mexico Officials from enforcing *Adobe Whitewater* may not return the Landowners' right to exclude, it would redress the risk of state prosecution. Thus, it would redress "*an* injury." *Larson,* 456 U.S. at 243 n.15.

20

Furthermore, in noting that the public could also enforce its right to access the Landowners' streambeds, the district court appears to have reasoned that a threat of enforcement must be completely redressable by a favorable decision. But we have never required that an injury be completely redressable. *See Consumer Data Indus. Ass'n*, 678 F.3d at 903. And, where the named defendants have special authority to enforce the challenged law, we have rejected arguments that shared enforcement authority with the public defeats redressability. *See id.* at 905–06 (holding that shared enforcement authority with private litigants would not defeat redressability where a pre-enforcement lawsuit is brought against officials with special enforcement authority, such as the attorney general); *cf. Nova Health Sys.*, 416 F.3d at 1157 (holding that an injury was not redressable in a lawsuit against administrators of public health institutions where those administrators had no greater authority to enforce the law than other private litigants).

The New Mexico Officials in this case include individuals with special authority to enforce *Adobe Whitewater*, such as the New Mexico attorney general. The fact that private litigants may also have a right to individually enforce their rights does not undermine the special threat of enforcement posed by the New Mexico Officials, which is redressable by a favorable decision. Because the Landowners have demonstrated an injury, traceability, and redressability, they possess standing to bring their claims.

### B.    *Sovereign Immunity*

The district court held that the Landowners' claims were barred by Eleventh Amendment sovereign immunity because their claims cannot be properly characterized as prospective falling within the *Ex parte Young* exception. Specifically, the court assumed

21

that a favorable ruling would require the New Mexico Officials to pay compensation out of an obligation to enforce the public waters provision. The district court also held that the Eleventh Amendment barred the Landowners' claims for the additional reason that they failed to exhaust state-law remedies. Lastly, while not addressed by the district court, the New Mexico Officials ask us to alternatively hold that the Landowners' claims are barred as the equivalent of a quiet title action under *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997).

We disagree with the reasoning of the district court and reject the New Mexico Officials' argument that *Coeur d'Alene* bars the Landowners' claims. The Landowners seek only an injunction on future enforcement, which is not the functional equivalent of damages for past deprivations of their right to exclude. Thus, their relief requested is properly characterized as prospective and falls within the *Ex parte Young* exception. Furthermore, if the Landowners were to succeed on the merits of their claims, we are unpersuaded that the New Mexico Officials would be obligated to pay compensation as opposed to merely ceasing enforcement of *Adobe Whitewater*.

Because the Supreme Court has overruled its prior exhaustion requirement, the Landowners' claims were not barred for failure to exhaust state remedies. And although the Eleventh Amendment bars claims for damages in federal court where there is an adequate state-law remedy, we decline to extend such a requirement to claims for injunctive relief within the *Ex parte Young* exception. Finally, we reject the New Mexico Officials' argument that this case is the functional equivalent of a quiet title action barred by *Coeur d'Alene*.

22

1.    **Standard of Review**

The Eleventh Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment has been read broadly to bar "suits against a state in federal court commenced by citizens of that state or citizens of another state." *Elephant Butte Irrigation Dist. of N.M. v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998). Thus, the amendment stands for "the privilege of the sovereign not to be sued without its consent." *See Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). This privilege extends to arms of the state and state officials who are sued for damages in their official capacity. *See Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013). Once asserted, sovereign immunity acts as "a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Id.*

That said, "Eleventh Amendment immunity 'is not absolute.'" *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)). An exception to sovereign immunity recognized in *Ex parte Young* "allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (citing *Ex parte Young*, 209 U.S. at 159–60). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal

23

law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation, brackets, and internal quotation marks omitted).

2.      **Analysis**

    *a.*      *Prospective relief*

The district court ruled that the *Ex parte Young* exception to sovereign immunity could not apply because the requested injunction "effectively (and impermissibly) requires the payment of funds from the State's treasury." App. at 182. Because state officials take an oath to support the state constitution, the district court reasoned that the New Mexico Officials would "have no choice but to continue enforcing the public's constitutional right to recreate in public waters." *Id.* If this enforcement amounted to a taking as alleged, the district court concluded that the New Mexico Officials would be required to pay the Landowners compensation using funds from the state treasury. Only through this compensation could the New Mexico Officials continue to enforce the public waters provision consistently with the U.S. Constitution.

In *Edelman v. Jordan*, 415 U.S. 651 (1974), the Supreme Court acknowledged a class of cases that do not fall within the *Ex parte Young* exception. Actions for injunctive relief against a state official may nonetheless be barred by sovereign immunity "[w]hen the action is in essence one for the recovery of money from the state." *Id.* at 663 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). The Court called for a practical consideration of whether the relief requested looked more like one for damages for past conduct or truly prospective relief. Where the relief requested is "measured in

24

terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials" and the result of the injunction is "in practical effect indistinguishable . . . from an award of damages against the State," the Eleventh Amendment will bar the lawsuit. *Id.* 668–69.

A claim was therefore barred where the plaintiffs sought an injunction requiring the state to pay retroactive monetary reimbursement of withheld assistance benefits. *See id.* at 655–56, 665. However, the Court made clear that fiscal consequences to the state from future compliance with a judicial decree are insufficient to bar the claim. *See id.* at 667–68. So long as the fiscal consequences are the necessary result of prospective compliance with the law, rather than a means to achieve "reparation for the past," the doctrine of *Ex parte Young* would apply. *See id.* at 665, 667–68. "Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young . . . ." *Id.* at 668.

As a threshold matter, the Landowners' requested injunction does not effectively seek compensation for a past wrong such that it falls within the reasoning of *Edelman*. The Landowners do not seek compensation for past deprivations of their right to exclude. Rather, the Landowners request a prospective injunction against future deprivations of their right to exclude without compensation. Thus, the Landowners' claims fall within the *Ex parte Young* exception to sovereign immunity by "alleg[ing] an ongoing violation of federal law and seek[ing] relief properly characterized as prospective." *See Verizon Md., Inc.*, 535 U.S. at 645 (internal citation omitted).

25

Furthermore, we are not persuaded that the duty to uphold the New Mexico Constitution would require the New Mexico Officials to pay compensation if *Adobe Whitewater* were declared an unconstitutional taking. Instead, the New Mexico government would have the choice of providing just compensation or abandoning efforts to enforce *Adobe Whitewater*'s holding. Unless and until the state government decided to provide compensation, the New Mexico Officials would not only have no obligation to enforce *Adobe Whitewater*, but they would have no authority to do so.

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2019). "A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place." *Id.* at 193. Because *Adobe Whitewater* does not provide for compensation to the Landowners, a determination that the decision took the Landowners' property would render *Adobe Whitewater*'s holding unconstitutional.

Yet if the *Adobe Whitewater* holding were unconstitutional, the New Mexico Officials would have no obligation or authority to enforce it. Indeed, the lack of authority to enforce state laws that come into conflict with federal law is the foundational principle behind *Ex parte Young*. There, the Supreme Court held that a lawsuit seeking an injunction against future or ongoing violations of federal law was not really a lawsuit against the state because, when an official acts contrary to federal law, he acts outside of his state authority. *See Ex parte Young*, 209 U.S. at 159–60 ("If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in

26

proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.").

Therefore, the practical effect of granting the Landowners' requested injunction would be to halt enforcement of *Adobe Whitewater*'s holding. New Mexico could then decide whether to provide compensation and apply the law constitutionally or to simply abandon its enforcement efforts. Because the Landowners allege a violation of federal law and their requested relief is properly characterized as prospective, *Edelman* does not bar their claims.

b.      *State-law remedies*

The district court separately held that the Eleventh Amendment bars the Landowners' claims because they failed to exhaust state remedies, and "New Mexico courts provide ample takings remedies." App. at 186 & n.4. As outlined in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–95 (1985), the Supreme Court once required exhaustion of state-law remedies before bringing a taking claim, reasoning that no unconstitutional taking had occurred until state remedies had been exhausted and the state had denied compensation. The Court, however, overruled the exhaustion requirement in *Knick v. Township of Scott*, holding that a Takings Clause violation occurs the moment property is taken without compensation. 588 U.S. at 190.

While the district court acknowledged that *Williamson County* had been overruled in part by *Knick*, it nonetheless cited *Williamson County* as if the state exhaustion

27

requirement were still in effect. And it faulted the Landowners for not first bringing their claim in state court. Accordingly, the district court erred when it determined that *Williamson County* barred the Landowners' claims because of their failure to exhaust state-law remedies.

The New Mexico Officials acknowledge that *Knick* overruled the Supreme Court's prior exhaustion requirement. However, they maintain that *Knick* had no impact on sovereign immunity's separate ban on asserting taking claims against a state in federal court where the state provides a remedy. They therefore argue that sovereign immunity bars this lawsuit because New Mexico offers adequate state-law remedies.

We have held that sovereign immunity bars a taking claim against a state unless there is no adequate remedy in state court. *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213–14 (10th Cir. 2019). Because *Knick* involved a lawsuit against a municipality, the Eleventh Amendment was not implicated. *See Couser v. Gay*, 959 F.3d 1018, 1023 (10th Cir. 2020) (noting that Eleventh Amendment immunity does not extend to municipalities). And we held in *Williams v. Utah Department of Corrections* that *Knick* had no impact on this separate sovereign immunity bar. However, the principal request for relief that we analyzed in *Williams* was for damages. 928 F.3d at 1211. There, we found that the plaintiff had failed to state a claim for prospective relief falling within the *Ex parte Young* exception. *Id.* at 1214–15.

The New Mexico Officials argue that this sovereign immunity bar to taking claims also applies to lawsuits brought under *Ex parte Young* where there is an adequate remedy under state law. In support of their argument, the New Mexico Officials cite language

28

from *Knick* assuring states that federal courts will not enjoin their activities so long as state law provides a means of obtaining compensation. After overruling the exhaustion requirement, the Supreme Court in *Knick* reassured governments that their actions would not be invalidated every time they failed to provide compensation in advance of a taking. *Knick*, 588 U.S. at 185. "So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities." *Id.*

But a fuller review of *Knick*'s discussion belies the suggestion that this is supportive of the New Mexico Officials' argument. The Court explained that *Williamson County* had relied on past cases denying requests for injunctive relief where there was an adequate remedy at law. *See Knick*, 588 U.S. at 194–95, 198–202 (citing cases). For example, the Court in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016–20 (1984), vacated the district court's judgment enjoining enforcement of a law for violating the Takings Clause because an arbitration mechanism provided a means to obtain compensation, and the Tucker Act was available to challenge the sufficiency of compensation. The Court stated that the district court erred in enjoining the law because "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use . . . when a suit for compensation can be brought against the sovereign subsequent to the taking." *Id.* at 1016, 1019. To the extent that *Williamson County* relied on this equitable principle, the Court in *Knick* reasoned "[t]hat much is consistent with our precedent." 588 U.S. at 195. "[T]he availability of subsequent compensation meant

29

that such an equitable remedy was not available." *Id.* at 198. Lack of entitlement to an injunction, however, did not mean that no taking violation had occurred. *Id.* at 199.

We are not convinced that *Knick*'s discussion of state-law remedies reflects a jurisdictional bar for taking lawsuits that otherwise fall within the requirements of *Ex parte Young*. Rather, the Court's assurances in *Knick* reflect the well-settled principle that equitable remedies are unavailable where there is an adequate legal remedy. *See Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1144 (10th Cir. 2012) ("As tradition goes, the equitable power of the courts is available only when legal remedies are demonstrably inadequate.").

Indeed, a panel of this court recently reached this same conclusion and rejected the argument now made by the New Mexico Officials. In *Teva Pharmaceuticals USA, Inc. v. Weiser*, No. 24-1035, 2025 WL 2555552, at *2–3 & n.3 (10th Cir. Sep. 5, 2025) (unpublished),[2] we declined to analyze the availability of state-law remedies within our *Ex parte Young* analysis for taking claims. Rather, we opted to conduct our established "straightforward inquiry" of whether the plaintiff "seeks relief properly characterized as prospective." *See id.* (quoting *Verizon*, 535 U.S. at 645). The panel noted that whether relief could be properly characterized as prospective and whether injunctive relief was ultimately warranted were separate questions. *Id.* at *3. "While a court may not *award* injunctive relief unless no adequate remedy at law exists, *Ex parte Young* allows [a] Plaintiff to seek it." *Id.*

---

[2] We cite unpublished cases for their persuasive value only and do not treat them as binding authority. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

We are persuaded by the reasoning in *Teva Pharmaceuticals* that plaintiffs asserting taking claims need satisfy only our established *Ex parte Young* inquiry. While legal remedies under New Mexico law may prevent a federal court from awarding the Landowners' requested equitable relief in the form of injunction, sovereign immunity will not prevent them from seeking such a remedy.

c.    *Coeur d'Alene*

Although the district court did not address this issue, the New Mexico Officials argue that the Landowners' claims are additionally barred by the exception to *Ex parte Young* announced in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997).

In *Coeur d'Alene*, the Supreme Court held the Eleventh Amendment barred a lawsuit by an Indian tribe against state officials, where the tribe sought a declaration of its entitlement to the exclusive use, occupancy, and right to quiet enjoyment of submerged lands claimed by the State of Idaho. 521 U.S. at 265, 281–82. The Court justified its rejection of *Ex parte Young* on the basis that the tribe's suit was equivalent to a quiet title action and the relief sought would erase the state's regulatory authority over the disputed land. *Id.* at 282. The Court explained that the relief requested would shift "substantially all benefits of ownership and control" from the state to the tribe and would entail "consequences going well beyond the typical stakes in a real property quiet title action." *Id.* Indeed, the state would be stripped of all regulatory jurisdiction over land "long deemed . . . to be an integral part of its territory." *Id.* These concerns were magnified because the land in question was submerged, and states have historically had especially

31

strong sovereign interests in navigable waters and the lands underlying them. *See id.* at 283–84.

We have noted, however, that *Coeur d'Alene* is an "extreme and unusual case," *Harris v. Owens,* 264 F.3d 1282, 1293 (10th Cir. 2001) (quotation marks omitted), limited to the sorts of "literal land grab effort[s]" that would divest a state of its sovereign authority over its lands. *See Hill v. Kemp*, 478 F.3d 1236, 1259–60 (10th Cir. 2007) (instructing courts to conduct the "straightforward inquiry" outlined in *Verizon* and noting that "[n]othing in [the lawsuit] call[ed] to mind the sort of literal land grab effort made by the plaintiffs in *Coeur d'Alene*"); *see also Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 913 (10th Cir. 2008) ("To the extent it is even appropriate to draw comparisons to *Coeur d'Alene* after *Verizon Maryland*'s instructions . . . . a favorable judgment in this case would not entitle [the plaintiff] to appropriate Oklahoma water in the same way that a quiet title action conclusively determines the parties' rights to real property."); *Va. Off. for Prot. & Advoc.*, 563 U.S. at 255–57 (rejecting the argument that *Coeur d'Alene* applies outside of circumstances seeking to "extinguish the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory" (quoting *Coeur d'Alene*, 521 U.S. at 282) (quotation marks and ellipses omitted)).

In this case, the Landowners' claims are nothing like the literal land grab effort seen in *Coeur d'Alene* and would not divest New Mexico of sovereign authority. Indeed, there is no dispute that the Landowners claim title to the streambeds at issue or that New Mexico will continue to have regulatory authority over those streambeds. The only dispute concerns whether the public can continue to have a limited easement to use the

32

Landowners' private streambeds for recreation. Accordingly, *Coeur d'Alene* does not bar the Landowners' claims.

### C.     Rooker-Feldman *Doctrine*

Also on appeal, the New Mexico Officials argue that the *Rooker-Feldman* doctrine bars Mr. Briones's claims because he was subject to a final order from a state court when the Landowners filed their lawsuit. The Landowners argue that, because they do not challenge Mr. Briones's consent decree and do not ask the federal courts to overturn it, the doctrine does not bar Mr. Briones's claims.

The *Rooker-Feldman* doctrine establishes, as a question of subject matter jurisdiction, that only the United States Supreme Court has appellate authority to review a state-court decision. *See Bruce v. City and County of Denver*, 57 F.4th 738, 746 (10th Cir. 2023); 28 U.S.C. § 1257(a) (establishing Supreme Court jurisdiction to review certain "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had"). The doctrine bars lower federal courts from reviewing claims where "(1) the plaintiff lost in state court, (2) the state court judgment caused the plaintiff's injuries, (3) the state court rendered judgment before the plaintiff filed the federal claim, and (4) the plaintiff is asking the district court to review and reject the state court judgment." *Bruce*, 57 F.4th at 746.

But *Rooker-Feldman* "does not deprive a federal court of jurisdiction to hear a claim just because it could result in a judgment inconsistent with a state-court judgment." *Mayotte v. U.S. Bank Nat'l Ass'n for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2006-4*, 880 F.3d 1169, 1174 (10th Cir. 2018). Rather, barred claims

under *Rooker-Feldman* are "those 'complaining of injuries caused by state-court judgments.'" *Campbell v. City of Spencer*, 682 F.3d 1278, 1283 (10th Cir. 2012) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). "In other words, an element of the claim must be that the state court wrongfully entered its judgment." *Id.* Although claim or issue preclusion may prevent parties from relitigating the same issues on the same facts as were resolved in a state court judgment, there is no jurisdictional bar to doing so under *Rooker-Feldman*. *Mayotte*, 880 F.3d at 1174.

Here, Mr. Briones's claim rests on actions taken by the New Mexico Supreme Court that precede the entry of judgment in March 2024. Mr. Briones entered a consent decree prohibiting him from erecting barriers, putting up signs, and using threats to keep the public from exercising their right to recreate in public waters. But Mr. Briones's claim in this litigation can be proven without mention of his consent decree. And in asking for an injunction barring future enforcement of the public's right to recreate in his streambeds, Mr. Briones does not ask this court to review or invalidate the state court judgment in his case.

Nor are Mr. Briones's injuries caused by the state court judgment. Rather than looking to past enforcement as his injury, Mr. Briones seeks only to enjoin future enforcement of the *Adobe Whitewater* holding, which does not involve the prior state court judgment. The fact that a judgment in federal court may be inconsistent with the consent decree does not preclude his claim. Accordingly, Mr. Briones's claim is not barred under *Rooker-Feldman*.

### D.    Abstention

Finally with respect to the jurisdictional arguments, the New Mexico Officials argue that principles of comity between state and federal governments preclude us from exercising jurisdiction over cases involving important state interests. They argue that "New Mexico has a strong interest in interpreting its own constitution, resolving issues of state property law, retaining control over its natural resources, and preserving public access to those resources grounded in the public trust that has existed through tribal, Spanish, and territorial times." Appellees' Br. at 41. Accordingly, the New Mexico Officials maintain that "[a] federal court contradicting a considered determination by a State's highest court of the scope of state property and state constitutional rights would be an unseemly intrusion on state sovereignty." *Id.*

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). While this obligation is not absolute, the Supreme Court has cautioned that, outside of exceptional circumstances it has identified when abstention is appropriate, federal courts "should not refuse to decide a case in deference to the States." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013) (internal quotation marks and brackets omitted). "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River,* 424 U.S. at 813.

The New Mexico Officials make no attempt to demonstrate that any of the recognized abstention doctrines apply to this case. Instead, they rely entirely on an appeal to general principles of comity between the states and the federal government.

Accordingly, we find that this argument was inadequately briefed and decline to consider it. *See* Fed. R. App. P. 28(a)(8)(A), 28(b) (requiring the argument section of both the appellant's and appellee's brief to contain "contentions and the reasons for them, with citations to the authorities . . . on which the [they] rel[y]"); *Bronson*, 500 F.3d at 1104 ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in [a party's] . . . brief.").

### E.    Judicial Takings

Having determined that the Landowners have standing and that sovereign immunity does not bar their claims, we turn to whether the Landowners' Complaint states a claim for a Fifth Amendment taking. We note that while the district court did not reach this issue, the Landowners ask us to "decide whether the complaint states a claim for relief rather than remanding for this determination." Appellants' Br. at 42. n.12. "Where an issue has been raised, but not ruled on, proper judicial administration generally favors remand for the district court to examine the issue initially." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1238 (10th Cir. 2005). However, "[t]o prevent cases from needlessly bouncing back and forth between district and appellate courts, this court is entitled to affirm a district court on alternative grounds that court didn't consider if those grounds are adequate, apparent in the record, and sufficiently illuminated by counsel on appeal." *Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016).

All those requirements are met here. The Landowners fail to show their claimed right to exclude was established such that their property rights were taken as opposed to merely clarified. We therefore assume without deciding that the Fifth Amendment

protects against judicial takings and affirm on the alternative ground that the Landowners

fail to state a claim for relief.[3]

## 1.    Standard of Review

When determining whether a complaint states a claim for relief, we apply the

standards of Federal Rule of Civil Procedure 12(b)(6). To survive a Rule 12(b)(6) motion

to dismiss, a plaintiff's complaint must allege sufficient facts "to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A

---

[3] The dissent expresses concern that, by affirming on this alternative ground, we deprive the Landowners of an opportunity to amend their Complaint. In support, it cites to our general rule that "a party should be granted an opportunity to amend his claims prior to a dismissal with prejudice." *See Sheldon v. Vermonty*, 269 F.3d 1202, 1207 n.5 (10th Cir. 2001). The Landowners, however, have not requested leave to amend at any point in this litigation. *See Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) ("[A] court need not grant leave to amend when a party fails to file a formal motion.").

Furthermore, our decision today does not have the effect of dismissing the Landowners' Complaint with prejudice. Although dismissal under Rule 12(b)(6) is ordinarily a dismissal with prejudice, a district court may specify that such a dismissal is without prejudice. *See* Fed. R. Civ. P. 41(b); *see also Orr v. Clements*, 688 F.3d 463, 465 (8th Cir. 2012) (stating that a dismissal under Rule 12(b)(6) "can be rendered without prejudice if the court so specifies"); *Carter v. Norfolk Cmty. Hosp. Ass'n*, 761 F.2d 970, 974 (4th Cir. 1985) ("A district court's dismissal under Rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice. That determination is within the district court's discretion."); *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 132 (D.C. Cir. 2012) (Kavanaugh, J., concurring) ("[U]nder Rules 41(b) and 12(b)(6), a district court has discretion to dismiss a complaint without prejudice when the district court concludes that the circumstances so warrant."). Here, in making its ruling on jurisdictional grounds, the district court dismissed the Landowners' claims without prejudice. *See* Fed. R. Civ. P. 41(b). Our affirmance does not change the nature of the district court's dismissal. Indeed, in the absence of a cross-appeal, we are precluded from altering the judgment to benefit a nonappealing party. *See Greenlaw v. United States,* 554 U.S. 237, 244 (2008). This rule bars us from altering a dismissal without prejudice to one with prejudice. *June v. Union Carbide Corp.*, 577 F.3d 1234, 1248 n.8 (10th Cir. 2009). Thus, our decision today does not bar the Landowners from pursuing their claims in the future if they come forward with additional factual allegations.

claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

In our Rule 12(b)(6) analysis, we "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial . . . ." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010) (quotation marks omitted). Rather, "[w]e accept all well-pled factual allegations as true and view these allegations in the light most favorable to the nonmoving party." *Id.* Where the appeal is from a decision granting a motion to dismiss, we review de novo whether a complaint states a claim for relief under Rule 12(b)(6).[4] *Brown v. City of Tulsa*, 124 F.4th 1251, 1263 (10th Cir. 2025).

## 2.    Legal Background

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. What counts as "property" depends both on existing "state law" and on "'traditional property law principles,' plus historical practices and [Supreme Court] precedents." *Tyler v.*

---

[4] Here, the district court did not reach the issue of whether the Complaint failed to state a claim under Rule 12(b)(6).

*Hennepin Cnty.*, 598 U.S. 631, 638 (2023) (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 167 (1998)). While actions by legislative and executive bodies are frequently the subject of taking claims, it remains unsettled whether the Takings Clause protects against judicial decisions affecting an individual's property rights.

In 2010, the Supreme Court considered this question in *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 560 U.S. 702 (2010). There, the Court examined whether a decision by the Florida Supreme Court, which allowed the state to restore eroded beaches and claim title to the newly added land, amounted to an unconstitutional taking without compensation. *Id.* at 709–12. Specifically, beachfront property holders argued that the decision took their rights to further additions to their property through sediment deposits (accretions) and their right to have their property touch the water. *Id.* at 711–12.

Florida law provided that the state held submerged lands in trust for the public. *Id.* at 707. Beachfront property holders—known as littoral landowners—owned land down to the mean high-water line. *Id.* at 707–08. Under Florida common law, littoral landowners automatically took title to additional land added through accretions, the gradual addition of land through natural depositing of sediment. *Id.* at 708. But littoral landowners did not take title to land added through avulsions, a sudden change to the land on the beach through, for example, a hurricane. *Id.* at 708–09. Thus, when an avulsion has added new land, the littoral owner would no longer own the land down to the mean high-water mark and would have no further rights to land added through accretion. *Id.* at 709.

Florida passed a law that would allow the state to restore eroded beaches and set an erosion control line as a littoral landowner's new property line, thereby eliminating littoral landowners' rights to future additions to their land through accretions and eliminating their right to have their land touch the water. *Id.* at 709–10. The Florida Supreme Court concluded that this law was not an unconstitutional taking of littoral landowners' property, holding that the doctrine of avulsion permitted the state to reclaim the restored beach. *Id.* at 712.

The U.S. Supreme Court granted certiorari to consider whether the Florida Supreme Court's decision took property without just compensation in violation of the Takings Clause of the Fifth Amendment. *Id.* at 707, 712. While all eight participating justices[5] concurred in the judgment that the Florida Supreme Court's decision was not a taking, *id.* at 706, 733, no opinion commanded a majority of the Court, leaving the status of judicial-taking claims in doubt.

Writing for a four-justice plurality, Justice Scalia suggested that the Fifth Amendment protects property owners against judicial takings. "If a legislature *or a court* declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation." *Id.* at 715. Justice Scalia reasoned that "[t]here is no textual justification for saying that the existence or the scope of a State's power to expropriate private property without just compensation varies according to the branch of

---

[5] Justice Stevens did not participate in the decision. *Stop the Beach Renourishment, Inc. v. Fla. Dep't. of Env't Prot.*, 560 U.S. 702, 733 (2010).

government effecting the expropriation." *Id.* at 714. Rather, using common sense, "[i]t would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat." *Id.* Importantly for our purposes, the plurality opinion distinguished between decisions that change property law, which would be unconstitutional without compensation, and those that merely clarify property law, which would be permissible. "[I]nsofar as courts merely clarify and elaborate property entitlements that were previously unclear, they cannot be said to have taken an established property right." *Id* at 727.

Two opinions concurring in part and concurring in the judgment, however, expressed doubt about the idea that a judicial decision could give rise to a Fifth Amendment taking, but they found it unnecessary to decide the issue. First, Justice Kennedy's concurrence in part and concurrence in the judgment, joined by Justice Sotomayor, drew attention to difficulties with applying the Takings Clause to judicial decisions. Among other things, Justice Kennedy noted the difficult questions that would arise regarding how judicial-taking claims could be brought and what remedies would be available to prevailing parties. *Id.* at 740–41. While he ultimately considered the question unnecessary to decide in that case, Justice Kennedy suggested that the Due Process Clause might be a better vehicle for the Court's concerns, opining that "[t]he Court would be on strong footing in ruling that a judicial decision that eliminates or substantially changes established property rights, which are a legitimate expectation of the owner, is 'arbitrary or irrational' under the Due Process Clause." *Id.* at 736–37.

41

In the second concurrence in part and concurrence in the judgment, Justice Breyer, joined by Justice Ginsburg, likewise thought the question of judicial takings was better left to another day. *Id.* at 742. While expressing no opinion on the soundness of the plurality's ultimate conclusions, Justice Breyer warned that unnecessarily deciding the issue "would invite a host of federal taking claims without the mature consideration of potential procedural or substantive legal principles that might limit federal interference in matters that are primarily the subject of state law." *Id.* at 743. Justice Breyer thereby raised comity and federalism concerns, noting that recognizing claims for judicial takings "would create the distinct possibility that federal judges would play a major role in the shaping of . . . state property law." *Id.* at 744.

Notwithstanding these disagreements, the Court unanimously concluded that the landowners had not met their burden to show that, prior to the decision, "littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land" and take title to those lands pursuant to the doctrine of avulsion. *Id.* at 730. The landowners had failed to show that there was an exception to the state's right to avulsions when the state caused the sudden addition of land, and prior case law suggested that no such exception existed. *Id.* Accordingly, even if judicial decisions could form the basis for a Fifth Amendment taking, the Court held that the Florida Supreme Court did not invalidate an established property right, and its decision was therefore not an unconstitutional taking. *See id.* at 733.

42

3.      **Analysis**

The Landowners assert that, prior to *Adobe Whitewater*, all three branches of the New Mexico government recognized that owners of non-navigable streambeds had the right to exclude trespassers. Thus, the Landowners argue that the New Mexico Supreme Court contravened established property law and took their right to exclude when it held that the public had a right to walk and wade in private streambeds.

Addressing the merits of the Landowners' claims, we are faced with the difficult question of whether the Takings Clause protects against judicial takings. In the nearly sixteen years since *Stop the Beach Renourishment*, no court has definitively answered this question. Instead, courts have avoided the issue. Many courts, including several of our sister circuits, have assumed the validity of judicial-taking claims without deciding the issue and held that plaintiffs failed to state a claim for a judicial taking. *See, e.g.*, *Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1215–16 (9th Cir. 2020) (declining to answer whether the Fifth Amendment protects against judicial takings when "nothing in Nevada law" showed that plaintiffs had an established right to disputed property); *Petrie ex rel. PPW Royalty Tr. v. Barton*, 841 F.3d 746, 756 (8th Cir. 2016) (opting not to decide whether a claim for a judicial taking can be brought where it "would have failed" anyway). Others have disposed of their cases through jurisdictional and procedural bars, never reaching the merits. *See, e.g.*, *Pavlock*, 35 F.4th at 588–90 (holding that landowners along the banks of Lake Michigan lacked standing to bring their judicial-taking claims because the Indiana Supreme Court rather than the named defendants had caused the loss of the landowners' property rights); *Petro-Hunt,*

*L.L.C. v. United States*, 862 F.3d 1370, 1384–85 (Fed. Cir. 2017) (affirming the Court of Federal Claims' dismissal of the plaintiff's judicial-taking claim because the court "lack[ed] jurisdiction to review the merits of a decision rendered by a federal district court").

We take a similar approach here because, even if judicial-taking claims exist, the Landowners have failed to state a claim for a judicial taking as outlined in *Stop the Beach Renourishment*'s plurality opinion. The Landowners bear the burden of demonstrating that their rights were sufficiently established before *Adobe Whitewater* such that this decision amounted to a judicial taking. *See Stop the Beach Renourishment*, 560 U.S. at 730 ("There is no taking unless petitioner can show that, before the Florida Supreme Court's decision, littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land."); *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) ("The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." (quoting *Twombly*, 550 U.S. at 556)). The Landowners' allegations in this case are plainly insufficient.

In his plurality opinion, Justice Scalia maintained that courts do not take established property rights where they "merely clarify and elaborate property entitlements that were previously unclear." *Stop the Beach Renourishment*, 560 U.S. at 727. In doing so, he emphasized that we owe substantial deference to state courts. *Id.* at 726 n.9. "A property right is not established if there is doubt about its existence; and when there is doubt we do not make our own assessment but accept the determination of the state

court." *Id.* The Landowners' Complaint does not plausibly allege that *Adobe Whitewater* changed established law as opposed to clarifying of the scope of the public's easement to use public water.

As the Landowners concede, whether their property rights were established is a question of law. *See Tompkins v. United States Dep't of Veterans Affs.*, 16 F.4th 733, 739 n.7 (10th Cir. 2021) ("The existence of a property interest is . . . a question of law, not one of fact."); *Tarabishi v. McAlester Reg'l Hosp.*, 827 F.2d 648, 652 (10th Cir. 1987) ("Whether the facts establish a property interest is a question of law."); *see also Anderson v. United States*, 23 F.4th 1357, 1362 (Fed. Cir. 2022) ("Whether a taking occurred is a legal question based on factual underpinnings. . . . [D]etermining the scope of a compensable property interest is a question of law."). The Landowners argue that every branch of the New Mexico government recognized their right to exclude the public. We address each of the Landowners' factual allegations in support of this historic recognition in turn.

Addressing recognition by the courts, the Landowners point to a statement in the denial of a motion for rehearing in *Red River Valley*. In that order, the New Mexico Supreme Court considered and rejected various arguments suggesting that the owners of land below public waters had exclusive rights to the water under the riparian system. *Red River Valley Co.*, 182 P.2d at 457, 461. After rejecting these arguments, the court reiterated some of the reasons for its initial decision and attempted to pacify concerns about the reach of its holding, stating that

45

> no person has the right to approach public water through private property, or fish in public water while on private property without the consent of the owner; but he may fish in public water if he does not trespass upon the lands of another; and fishing in public water from a boat is not a trespass upon the property of the owner of the underlying land.

*Id.* at 464. Notably, however, the Landowners fail to cite to a single New Mexico case rejecting the argument that the public has an incidental right to access private streambeds and banks for the purpose of using public water.

The court in *Red River Valley* explicitly declined to consider the question of private land touching public waters. *See id.* at 427 ("The question of right of use, or trespass upon, the lands of appellee bordering upon the lake area in question is not involved."). Yet the Landowners suggest that, by excluding land use from its consideration, the court in *Red River Valley* intended its ruling to foreclose such a right.

However, much of the language in the *Red River Valley* decision contemplates the possibility of an incidental right to use private land. Citing to Las Siete Partidas, a Spanish Code relevant to the law that applied prior to New Mexico's statehood, the court quoted the following language as influential to their finding of a public right to fish:

> And although the banks of rivers are, so far as their ownership is concerned, the property of those whose lands include them, nevertheless, every man has a right to use them, by mooring his vessels to the trees, by repairing his ships and his sails upon them, and by landing his merchandise there; and fishermen have the right to deposit their fish and sell them, and dry their nets there, and to use said banks for every other purpose like those which appertain to the calling and the trade by which they live.

*Id.* at 429 (citation omitted).

To be sure, the denial of rehearing in *Red River Valley* contains language asserting that "no person has the right to approach public water through private property, or fish in public water while on private property without the consent of the owner." *See id.* at 464. But this language does not appear in the court's initial decision. Nor does it relate to the basis for which rehearing was sought. Instead, the denial of rehearing concerned arguments relating to the public's right to access the water, including whether the court properly applied Spanish-Mexican law to find a public water right and whether land granted through a United States land patent could be subject to that public water right. *See id.* at 457–60. Thus, the language assuring that "no person has the right to . . . fish in public water while on private property without the consent of the owner," *see id.* at 464, is dicta and of minimal value to showing that a right was established.

Furthermore, the language cited from the rehearing denial need not be read inconsistently with *Adobe Whitewater*'s holding. Importantly, the court in *Adobe Whitewater* emphasized that the public still did not have a right to cross private property to reach public water and did not have a right to use public water as a means to gain access to and trespass on privately owned land. 519 P.3d at 53. The court characterized the public right to access private streambeds narrowly, emphasizing "that the scope of the public's easement includes only such use as is reasonably necessary to the utilization of the water itself and any use of the beds and banks must be of minimal impact." *Id.* at 56. Accordingly, the Landowners have failed to show that their now-claimed right was established in New Mexico courts.

Notwithstanding the dearth of case law supporting their position, the Landowners argue that citing a case is unnecessary and urge us to instead look to "the state's past treatment of the property right" as well as traditional principles of property law. Reply Br. at 25.

Beginning with traditional principles, the Landowners point to the importance of the right to exclude under property law. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) ("The right to exclude is one of the most treasured rights of property ownership." (citation and internal quotation marks omitted)). However, the right to exclude is not absolute where the property is subject to a conflicting property right—at issue here, an easement. *See* Restatement (Third) of Property (Servitudes) § 1.2(1) (2000) ("An easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement."). Importantly, the Landowners do not dispute that the public has an easement to use public waters on their private land. Their dispute concerns only the scope of that easement. And yet the Landowners provide no traditional principle suggesting an established limitation that would foreclose an incidental right to touch private streambeds and banks.

As to past treatment, the Landowners continue to assert that their claimed right was recognized throughout New Mexico's government and point to their Complaint for facts supporting this assertion.

The supporting allegations, as stated both in their Complaint and opening brief, are that the Commission and the Department "issued consistent guidance that streambeds

48

were off limits without the consent of the owner." *See* Appellants' Br. at 43. Specifically, the Landowners point to two fishing proclamations issued by the Department. The first proclamation, issued in 1991, contains a section titled "Private Lands, Trespass, Stream Beds, Access" in which it directs the public to "[o]btain permission before fishing on private lands" and warning that the proclamation should not be construed as authorizing "entry into or onto any privately owned property, including stream beds, without the landowner's permission." App. at 37. And the second 1998 proclamation contains a section titled "Access for Fishing," which contains similar language. *Id.* at 48.

Aside from these fishing proclamations, the Landowners' only factual allegations regarding the state's treatment of their right to exclude the public is the 2015 law recognizing the right to exclude the public from private streambeds as well as the law's implementing regulations. This law and its implementing regulations were the subject of the New Mexico Supreme Court's holding in *Adobe Whitewater*, where the regulations were determined to be unconstitutional under New Mexico's public water provision. 519 P.3d at 56. And although the underlying law was upheld, it was interpreted consistently with the public's limited easement to touch land below public water, thereby avoiding the constitutional issue. *Id.* at 57.

Neither the Department's fishing proclamations nor the 2015 law and implementing regulations are sufficient to meet the Landowners' burden to show their claimed right to exclude was established. Language in a series of fishing proclamations is insufficient to plausibly suggest an established property right as opposed to an agency misinterpretation of New Mexico law. *See Twombly*, 550 U.S. at 554 (noting that Rule

8(a)(2) requires that a plaintiff plead facts plausibly suggesting, and "not merely consistent with," entitlement to relief). And we decline to find an established property right based on agency actions where near immediate legal challenge resulted in their invalidation. Such a history is plainly insufficient to dispel "doubt about [the] existence" of the Landowners' claimed right to exclude. *See Stop the Beach Renourishment*, 560 U.S. at 726 n.9.

To be sure, state law is not the only source of property rights, which likewise depend on "'traditional property law principles,' plus historical practices and [Supreme Court] precedents." *Tyler*, 598 U.S. at 638 (quoting *Phillips*, 524 U.S. at 167). However, the Landowners have failed to meet their burden to demonstrate that these traditional principles, historical practices, and precedents established their claimed property right. The facts before us instead support the New Mexico Supreme Court's conclusion that it merely clarified the scope of the public's easement to use public water and that the Landowners never enjoyed the right to exclude they claim.

Facts not alleged in the Complaint might suggest otherwise. Yet "it is not for us to conjure up facts that [the Landowners] declined to plead and then to draw inferences therefrom." *See Daunt v. Benson*, 999 F.3d 299, 309 (6th Cir. 2021). We therefore assume without deciding that the Fifth Amendment protects against judicial takings and affirm on the alternative ground that the Landowners fail to state a claim for relief.

### III.     CONCLUSION

For the reasons articulated above, we AFFIRM the district court's dismissal of the Landowners' Complaint on the alternative ground that they have failed to state a claim for a Fifth Amendment taking.

No. 25-2009, *Sanchez, et al. v. Torrez, et al.*
**FEDERICO**, Circuit Judge, concurring in part and dissenting in part.

I fully agree with the majority's incisive analysis of the standing, sovereign immunity, and other jurisdictional issues in this appeal. I therefore join Parts I–II.D of the majority opinion in concluding that we have jurisdiction to hear this case. From there, however, I part company with the majority. While the majority affirms because the plaintiffs (Landowners) fail to state a claim for a judicial taking, I would have stopped our decision at jurisdiction.

The district court ruled for the defendants (New Mexico Officials) solely on jurisdictional grounds. It never addressed whether the Landowners had sufficiently alleged a judicial takings claim. Although that does not bar us from reaching the issue, neither the Landowners nor the New Mexico Officials adequately developed their arguments on this point. Moreover, by affirming for failure to state a claim in this posture, the majority denies the Landowners an opportunity to amend their complaint. In my view, the more prudent path would have been to vacate the judgment and remand for the district court to assess the sufficiency of the Landowners' claim in the first instance. I respectfully dissent in part.

## I

As a court of appeals, "[w]e are a court of review, not of first view." *Moody v. NetChoice, LLC*, 603 U.S. 707, 726 (2024) (quoting *Cutter v. Wilkinson*, 544

U.S. 709, 718 n.7 (2005)). For this reason, we have frequently explained that "[w]here an issue has been raised, but not ruled on [by the district court], proper judicial administration generally favors remand for the district court to examine the issue initially." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1238 (10th Cir. 2005); *accord Timmins v. Plotkin*, 157 F.4th 1275, 1282 (10th Cir. 2025). To be sure, that is a discretionary principle, not a limit on our authority. *See Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016). But we should be careful about how we exercise that discretion and should not reflexively decide an appeal on alternative grounds every time a party asks us to do so. Rather, we must ensure that "those grounds are adequate, apparent in the record, and sufficiently illuminated by counsel." *Id.*

The parties to this appeal have not sufficiently illuminated their arguments on the merits of the Landowners' judicial takings claim. Between their opening and reply briefs, the Landowners allocate just over five pages to the matter. In their response brief, the New Mexico Officials offer even less, providing little more than a page. The parties' district court briefing is also of little help. It is similarly sparse, totaling five and half pages between both sides, and it contributes no additional substance to the parties' appellate arguments.

More importantly, the parties' cursory briefing fails to grapple with the complexity and novelty of the matter at hand. The law on judicial takings is

2

unsettled, and even the most basic question – Is there such a thing as a claim for a judicial taking? – remains largely unanswered. Assuming such a claim exists, as the majority does, invites more questions. We know that a judicial takings claim would require the Landowners to prove the existence of an "established" property right and the taking of that right, but we don't know much more than that. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 732 (2010). By what standard do we measure whether a property right is sufficiently established? And how does that legal standard intersect with the pleading rules under Federal Rule of Civil Procedure 12(b)(6)? The parties don't say.

Despite the lack of answers to these questions (and despite the parties' minimal-at-best efforts to provide such answers), the majority affirms on the basis that the Landowners failed to plead an established property right. Namely, the majority concludes that the Landowners did not have an established right to exclude the public from touching private streambeds. That may have been an acceptable approach if this were a simpler case where the Landowners offered "nothing" at all in support of their right. *See Wells Fargo Bank, N.A. v. Mahogany Meadows Ave. Tr.*, 979 F.3d 1209, 1216 (9th Cir. 2020). Were that so, the lack of clarity about standards would not prove to be an obstacle since the Landowners' claim would have failed under any standard. However, this appeal does not present that scenario. Here, even though the

3

parties failed to develop their positions on the applicable legal standards, they have each presented arguments about whether the Landowners' claimed property right is established.

The New Mexico Officials point out that a few years ago, the New Mexico Supreme Court expressly addressed whether New Mexico property law recognizes that claimed right. The Court held that such a right never existed. *Adobe Whitewater Club of N.M. v. N.M. State Game Comm'n*, 519 P.3d 46, 57–58 (N.M. 2022). This is a compelling argument because the state supreme court is "the final arbiter of . . . state law." *Montana v. Wyoming*, 563 U.S. 368, 377 n.5 (2011) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940)). And property rights are generally "created and defined by state law." *Fed. Land Bank of Wichita v. Bd. of Cnty. Comm'rs*, 788 F.2d 1440, 1441 (10th Cir. 1986).

Still, as the Landowners observe, state law is not the final word in the takings context. Certainly, "[s]tate law is one important source" that a federal court must consult when deciding a takings claim. *Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023). But the court must also look beyond state law to consider "traditional property law principles, plus historical practice and [the Supreme] Court's precedents." *Id.* (internal quotation marks and citations omitted).

The Landowners alleged precisely these kinds of non-state law sources in their complaint. They marshaled factual allegations about historical

4

practices, alleging that prior to *Adobe Whitewater*, both New Mexico's executive and legislative branches had recognized the claimed property right via proclamation, legislation, and regulation. In their appellate arguments, the Landowners also identified traditional property law principles and Supreme Court precedent characterizing the right to exclude as "'one of the most treasured' rights of property ownership." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)).

Since there are material arguments on both sides, determining whether the Landowners have sufficiently alleged an established property right requires us to weigh state law against the Landowners' non-state law sources. For guidance on this exercise, the majority refers to Justice Scalia's plurality opinion in *Stop the Beach*. There, Justice Scalia explained that federal courts should give "a considerable degree of deference to state courts" in determining whether a property right is "established." *Stop the Beach*, 560 U.S. at 726 n.9. Under that approach, "[a] property right is not established if there is doubt about its existence; and when there is doubt [federal courts] do not make [their] own assessment but accept the determination of the state court." *Id.*

*Stop the Beach* gives us a meaningful starting point but not the whole framework for evaluating when and whether property rights are established. It identifies a presumption in favor of state courts' interpretation of state law,

5

but it says nothing about the amount of non-state law support needed to overcome this presumption. *Stop the Beach* is also silent about how the established property right requirement interacts with the Rule 12(b)(6) pleading standard. After all, plaintiffs need not prove their claims to survive a Rule 12(b)(6) motion; all they need is to demonstrate plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). From that perspective, the bar for proving an established property right might be lower at the pleading stage than at summary judgment or at a trial on the merits. Perhaps a simple good faith argument that the state court was wrong on establishment could suffice to support a judicial takings claim, even if a plaintiff's burden would be higher at later stages. If that is the case, the Landowners would undoubtedly have done enough to avoid dismissal here.

Rule 12(b)(6) also requires courts to view well-pleaded factual allegations in the light most favorable to plaintiffs and to draw all reasonable inferences in their favor. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021). I am not convinced the majority followed this command when it took a dim view of the Landowners' allegations and sources of support. That said, the majority may not have needed to do so if the established property right requirement is a pure question of law, like statutory interpretation. But again,

6

the parties have not addressed this issue of fact versus law, leaving us one more unanswered and potentially dispositive question.[1]

In any case, we have precedent suggesting the established property right requirement has factual dimensions on which we must draw reasonable inferences in the Landowners' favor. *See Knellinger v. Young*, 134 F.4th 1034, 1043 (10th Cir. 2025) (holding that plaintiffs must prove, as an element of a takings claim, that the thing taken "was property"); *Tarabishi v. McAlester Reg'l Hosp.*, 827 F.2d 648, 652 (10th Cir. 1987) ("Whether *the facts* establish a property interest is a question of law." (emphasis added)). Questions about historical practice, which courts must consider under *Tyler*, also appear factual on their face.[2] 598 U.S. at 638.

---

[1] The majority points to the Landowners' purported concession that the established property right requirement is a question of law. Majority at 45. But the Landowners were discussing "legal conclusions" in the context of Rule 12(b)(6), where any allegation parroting an element of the claim is a "legal conclusion" (and thus need not be credited at the Rule 12(b)(6) stage) even if that element is factual. *See* Reply Br. at 34; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For example, the existence of an agreement in an antitrust case is a factual matter. Nonetheless, the Supreme Court has referred to unsupported allegations of agreement in a complaint as "legal conclusions." *See Twombly*, 550 U.S. at 564.

[2] The majority also cites *Tompkins v. U.S. Department of Veterans Affairs*, 16 F.4th 733 (10th Cir. 2021), and *Anderson v. United States*, 23 F.4th 1357 (Fed. Cir. 2022), in support of the proposition that the existence of a property right is a question of law. But both *Tompkins* and *Anderson* predate *Tyler*'s clarification that courts must consider historical practice. And *Tompkins* dealt with due process, not takings. 16 F.4th at 739 n.7.

## II

Apart from substantive concerns, I also have procedural misgivings about this result. Had the district court dismissed the complaint for failure to state a claim in the first instance, the Landowners would likely have had the chance to amend their complaint. That is because this court has said, "[a]s a general matter, a party should be granted an opportunity to amend his claims prior to a dismissal with prejudice." *Sheldon v. Vermonty*, 269 F.3d 1202, 1207 n.5 (10th Cir. 2001). The majority has deprived the Landowners of that chance by holding their complaint to be insufficient in the first instance on appeal.[3] While there are post-judgment procedures that allow amendment, it is much more difficult to amend through those procedures than it is to amend prior to judgment. *See BLOM Bank SAL v. Honickman*, 605 U.S. 204, 213 (2025) (amendment under Rule 60(b)(6) requires a showing of "extraordinary circumstances"). Now, we can only guess at whether there are further allegations the Landowners could have made to sustain their claim.

Of course, this court cannot "conjure up" what those allegations might have been. Majority at 50 (quoting *Daunt v. Benson*, 999 F.3d 299, 309 (6th Cir. 2021)). But that is all the more reason to remand. That way, the

---

[3] To the extent the majority faults the Landowners for not expressly requesting leave to amend, the Landowners have not yet had any occasion to request leave to amend on the merits of their claim.

Landowners could have raised those allegations themselves. If the additional allegations were still insufficient, the district court could have dismissed and entered judgment following a fulsome review of an amended complaint. Or, if no other allegations existed, the district court could have dismissed with confidence that it had considered the full universe of relevant allegations. As it stands now, I am concerned the majority has prematurely cut off litigation on a potentially meritorious claim.

In response to these procedural misgivings, the majority observes that the judgment against the Landowners remains a dismissal without prejudice such that the Landowners could refile and raise new allegations. Majority at 37 n.3. That may well be true. *Kerr v. Polis*, 20 F.4th 686, 704 (10th Cir. 2021) (en banc); *see also id.* at 717–19 (Bacharach, J., concurring). But it is also not so simple, as forcing the Landowners to refile before amending may lead to preclusion issues and could introduce statute of limitations problems.

More fundamentally, the possibility that the Landowners could file a new action raising the same claim undermines the majority's justification for deciding this appeal on alternative grounds in the first place. Our discretion to affirm on alternative grounds is rooted in the desire "[t]o prevent cases from needlessly bouncing back and forth between district and appellate courts." *Walton*, 821 F.3d at 1212. Yet that is precisely what will happen if the Landowners refile and the district court dismisses the refiled case – the

9

Landowners will appeal again. That is no different than what would happen if we had remanded, and the district court subsequently dismissed on the merits. Except, if we had remanded without reaching the Rule 12(b)(6) issue in the first instance, we would have saved the Landowners a needless filing fee and avoided any obstacles regarding preclusion or the statute of limitations. From that view, the majority has not captured any efficiencies but rather introduced new costs and inefficiencies.

* * *

For these reasons, I respectfully dissent only from the majority's decision to affirm for failure to state a claim.

10